We'll turn now to 24-3111, Yellow Corporation v. International Brotherhood of Teamsters. May it please the Court, my name is Ron Rossi and I represent the appellants, Yellow Corporation and its subsidiaries. I would like to reserve three minutes for rebuttal, if I may. Until July of 2023, before defendants' appellee's breaches of the NMFA forced a 99-year-old trucking company, Yellow, out of business, Yellow was the country's third-largest less-than-truckload-free carrier, employing 30,000 people, including approximately 22,000 Teamsters. This appeal arises from the District Court's dismissal of Yellow's complaint for an alleged failure to exhaust grievance procedures in the then-operative collective bargaining agreement, the National Master Freed Agreement, which is often referred to as the NMFA. Today, I want to make four points, if I may, any one of which, if credited by this panel, would militate in favor of reversal of the trial court's decision. The first one is that, as this circuit has recognized, exhaustion is excused where a union repudiates the grievance procedures in the collective bargaining agreement. In our complaint, and in the proposed amended complaint that was subsequently filed, Yellow spells out in great detail how it tried to grieve under the one applicable grievance mechanism that was available to it under the CBA, Article 8, Section 6, which was specifically designed for and dealt with changes of operations. And let's not be confused for a moment. What was at issue was perhaps the most mission-critical change of operation that Yellow had faced in its century-long history. Let me ask you about that. I thought you were just going to mention the four things very quickly, but if you're going to expand on things, I'll interrupt to ask about it. Yellow wanted to reorganize the way it ran its business. How much of that could it do without union approval? Yellow absolutely needed the union to approve certain aspects of that change of operations, and there was this contractually mandated procedure. Well, that focused on how seniority is computed as different units are merged and so on. Is that right? Was there anything else that was at issue besides the seniority? Well, yes, and that speaks to two things. One, if you think about a change of operations, it is perhaps the point of a CBA where management, who is managing a unionized labor force, has the most control, because management always retains entrepreneurial control of its business. So it's exactly the case, and it's always the case, for example, that a union can't say, oh, I don't think you should close that operation here and move it to a different city because I don't agree with your strategic decision to do that. So, yes, the union did not have the ability to affect the strategic decisions that Yellow was making about how it wanted to consolidate its network. But what the union had was the ability to affect seniority, affect driving lanes, affect a whole multiplicity of things that undergird the operational change. And the way that— It wasn't just seniority that was to be negotiated, right? Absolutely. And, in fact, there's a case we cite in the brief. It's a district court case from Pennsylvania that deals with a CHOPS procedure. And the case comes up to the district court, and there's a complaint by the union about the approval of the CHOPS procedure. And what wasn't at issue was seniority. What was at issue was whether or not certain local cartage routes were going to be allowed to go in or out of the region that was at issue under the change. So there's much more at issue than just seniority, although it is the predominant issue. And in the CHOPS procedure, that's more like negotiating a contract than a fact-finding and then, with those facts, determine what needs to be done under the master agreement. Is that correct? Well, the CHOPS procedure is complicated in the following sense. In this instance, we're talking about 70% of the network, so there were three regions of the country, many, many supplemental agreements that undergirded those regions, and many, many states at issue. And so the yellow went out to 106 local unions who were going to be affected by the change, published what the change was going to be, and then solicited objections. The objections they received back are not just seniority. The objections they received back are, why are you doing it this way? Why can't road drivers do this instead of utility employees and a host of other things? All of this gets worked out over a period of weeks and months and then culminates in a hearing, and this is the critical thing. The thing about the hearing is that there is a committee convened that's custom designed to deal with all of the many constituencies that are involved in the change of operations. And so that committee hears all of these objections, all of the various grievances. It deals with all of the seniority issues. And if things don't get worked out or hit an impasse, then there's an ability to grieve further to higher level committees or things are resolved. I want to know the nature of what's disputed in these grievances. That's why I said it sounds like the issues are policy issues that are being debated, not the meaning of the master agreement, not a dispute about facts, what happened. Those usually, those aren't at issue in these proceedings, are they? Typically not, although I guess if the union were to take the position, for example, that a change was extra contractual, such that you were asking an employee to do something that didn't otherwise, that they weren't otherwise compelled to do by contract, then the question would be resolved in the first instance by the CHOPS grievance process. Okay, we disagree with you that that's extra contractual. We think you're obligated to do that extra work or drive that extra route. But if you see it otherwise, let's try to work it out. And so the whole process is designed to deal with all of those issues. Now, either the CHOPS is contractual, in which case it's sort of self-executing, or the union raises objections such as it's extra contractual. You're asking me to do something I didn't already agree to do, and therefore you owe me more money to do that. Or there is a dispute about whether the manner in which it's being done, or we're going to have road drivers do this as opposed to local drivers or things of that nature, are resolved. And so the CHOPS process is a complex grievance mechanism. It's not some trifling thing, for sure. Can I ask you, counsel, under Article 8, it seems to me that from the district court's order to the briefs, there's disagreement about how the sections sort of work together. So at this point that you're discussing where Yellow has gone through the CHOPS process, they've solicited feedback from the local unions, they've gotten comments, they've convened a CHOPS committee hearing, and at some point the Teamsters walk away from the process. At that point, why couldn't Yellow then avail itself of going to, I think it's the National Grievance Committee, which as I read Article 8, it's designed to essentially give advisory opinions as to what was necessary steps to be taken. Yeah, so let me address your question. Let me just reiterate one thing. When they walked away from the Article 8, Section 6 grievance process, that is undeniably a repudiation of a grievance mechanism. That process is supposed to have been completed, in which case all issues would have either been resolved or coalesced, and then there might have been something to bring from that committee to the NGC. But leaving that aside for the moment, all that was left when we got into this sort of square, you know, round peg, square hole situation because the union unilaterally stopped the grievance process midstream, all that was left for Yellow to do. And I submit that Yellow at that point in time was well within its rights to go to the district court under the LMRA and seek relief for the breach, the egregious breach that happened when they abandoned the CHOPS. But leaving that aside, all that they had left on the grievance mechanism, theoretically, I think, was to go under 8-2-A. OK, so we agree with the union that under 8-2-A there's two kinds of jurisdiction for the NGC. There's review jurisdiction, which isn't an issue here because there was no final determination by a committee which could be adjudicated by the NGC. And there is what both sides call in their briefing original jurisdiction. Under the original jurisdiction of 2-A, there is a number of infirmities with respect to why Yellow did not need to do that. And remember, that's the only last availing thing if we want to talk theory here. One, it was not exclusive. TMI, not Yellow, so TMI had the right, which is an agent of Yellow's for negotiating purposes. TMI had the right to petition the NGC to hear the grievance. Alternatively, TINFINC, the union's agent, had the right to petition to hear the grievance. And the NGC retained discretion to decide whether it wanted to hear it in the first instance under these circumstances. Now, because neither TINFINC nor TMI should be left bereft of a remedy in the event that for whatever reason NGC declined to even hear it, it necessarily means there must be something else you can do. Leaving that aside, even if NGC had taken it, it is not able to make a final or binding determination. And even before we get to that, Judge Federico, even before we get to that, all it is allowed to do is resolve a question of interpretation under the NMFA. What question would Yellow have even been able to pose to the NGC that would have resolved the catastrophic consequences that were flowing from the breach of the grievance procedure that is designed to allow Yellow to retain operational control of its business? Remember, once the union walked away, once it walked away from the CHOPS process, the status quo was now immovably in place until such time as Yellow could regain operational control of its business. So the law does not require anyone to grieve something that is not going to result in a final and binding determination. And how do we know 2A is not final and binding? Well, we point out in our briefing, 21 times in the contractually agreed to grievance mechanism, it says it will be final and binding. You can search 2A high and low and you're not going to find that language. So all that was left to Yellow was to either try to get to a district court to get this resolved to save its business, or to continue to Hector with the union to at best get an advisory opinion. If we were going to send this back to the district court, what's the remedy you're currently seeking? Well, I think there are two remedies depending on how you want to go. One, this is a well-pled complaint under Rule 12b-6, and it should go back down for adjudication on the merits. And we should find out on the merits whether or not the union is responsible for what happened to Yellow. Leaving that aside... They have a much different version of what happened with the... They do, they do, but that's why... That has to be resolved. I'm sorry to interrupt you, Your Honor. They do, but that is why we adjudicate things on the merits. They might be right. But right now we're to 12b-6. This is a pleading. We're entitled to favorable inferences. So then your money remedy would be damages that flow from the breach of the master agreement? Now it would be. Now it would be because I'm standing in front of you essentially representing a ghost. Yellow's in liquidation, and what's left of Yellow would be seeking money damages. And we would be seeking to hold union leadership to account for what they did. And of course the union has its defenses. But those defenses are of no moment of merit right now in front of this tribunal on a Rule 12b-6 motion with such a well-pled complaint. How did Judge Robinson err on the futility determination that she made? So if we're going to take the position, and the law is interesting in this regard, if we're going to take the position that futility is something different than repudiation, she erred because we unearthed evidence, leaving aside the theory we pled about why this was deliberate, but we unearthed evidence that in the middle of the grievance process to resolve the chops, union leadership said to its board, we will not support in any way the Phase 2 chops. Now how? That wasn't before Judge Robinson when she issued this order. I'm sorry, Your Honor. It was before Judge Robinson on our motion for leave to amend. Judge Robinson did something very unusual, which I'll hit in the last 45 seconds, which was she entered judgment at the same time. This is a complicated case, and it's not our mind-run type of case, so I'm going to allow more time for argument than we normally do. Thank you. They'll have plenty of time to respond. Thank you, Your Honors. I deeply appreciate that because— Well, go ahead. Don't thank me. Just argue. Yellow's complaint was dismissed, and simultaneous with the dismissal of the trial court, Judge Robinson entered judgment. That's unusual. That's not the typical procedural posture. I was actually surprised to see that. I think that happens all the time, doesn't it? She might have goofed by not giving you the right to amend with new information, but I don't think that's so unusual. I was surprised that her experience was so different from what I'm observing. Fair enough, Judge Hart. I'm not going to stand in this great court in this great country and say that I know for sure whether or not in courts it's typical or atypical. I've seen case law that we cite in our briefs that say it's unusual to do it in that manner. The important point is the one you raised, which is that following Supreme Court precedent where Rule 15 and the freedom to amend is to be freely given, following that Supreme Court precedent, virtually every circuit in the country has determined that when, and frankly we're in the infancy of the case, so if you think about what happens after the judgment is entered in 59 and 60, there is sort of like a continuum. On one end of the continuum is a case where there was a trial. There were witnesses. The jury spoke. A judgment is entered, and you go to overturn that judgment because you want to amend your complaint. The court's interest in finality at that end of the continuum is paramount, and in virtually every circuit, unless you have some very compelling reason why that should happen, there's going to be finality in that judgment because there's a strong interest in finality. But we're not there. We are at the other end of the spectrum. We have not even had one substantive amendment of this complaint. You still have to have a good reason. Maybe you have a good reason here. I'm sure we have lots of cases that are dismissed on the complaint, and the judge doesn't allow amendments after judgment is entered. But here you have a decent argument. I'd like to hear your argument why on the facts of this case you had a right to reopen. Right. And, Your Honor, at the end of the day, whether it's a very, very liberal standard or whether or not it's a very harsh standard, you have to have something that you can plead that's going to give rise to a cognizable claim. I agree with you totally there. But the issue is we at the pleading, we have pled facts which, if credited by a trier of fact, could draw inferences from those facts, which would lead one to conclude that, A, the repudiation of the Chopp's grievance process, full stop, excuses exhaustion. Okay. So what you're saying is not that she erred by not allowing you to amend the complaint, but that she erred in graining judgment on the pleadings because you adequately pled repudiation or futility. That's what you're arguing now. You have a different argument that because you didn't get discovery until late, you didn't have facts that might have changed her mind. Am I right about that? You are correct. Well, you are correct that because we had newly discovered evidence, which we think is objective, in other words, it's not subjective. It doesn't reflect a subjective belief that it would have been futile to grieve. It's an objective fact that the union privately determined that it was not going to allow that Phase II Chopp's to go forward, but did not publicly disclose that. That's objective evidence. We have that new evidence in the proposed amended complaint. So, yes, I think the proposed amended complaint is stronger as a matter of pleading with respect to futility and, frankly, all of the other reasons why these are well-plaid claims. But I think the original complaint was perfectly adequate for its purpose and should have gone forward. Are you using futility and repudiation as synonyms here? That's a fair question because, again, exhaustion is not a jurisdictional doctrine. It's a judgment doctrine. In other words, it promotes labor peace. I think that's a laudable goal. And I agree with the union in this regard. It promotes labor peace to hold counterparties to collective bargaining agreements to the contractual grievance mechanisms they set up to deal with it. Oftentimes, for many of these grievances, they're esoteric and they know their business and the workings of the contracts and the course of dealing better than any court would. And so that's a laudable goal. But it's a creature of contract. And so in this instance, when you do not have something that you contractually agree to do, for example, Yellow did not contractually agree to do under the grievance mechanism to take a complicated chops, probably the most complicated one in its history, through directly to the NGC under 2A. It didn't contractually agree to do that. Since it didn't contractually agree to do that, it does no harm to the law to say you're excused from having to grieve because you didn't even agree to do it in the first instance. And so there is much here that militates in favor of allowing this case to go forward that I don't think does any underlying harm to the laudable purpose of holding people and counterparties to the grievance mechanisms that are set up. I'm going to give you extra time, but I want to keep it as compact as possible. So what's your answer to the question by Judge Timkovich? Are you saying that it's futile because they repudiated? How are you – what's the interrelationship between futility and repudiation? I think repudiation stands alone as a reason for excuse. I think it's futile because, particularly given the newly discovered evidence, where we know that going in, the game was already rigged. The union was not going to, under any circumstances, provide good faith cooperation with respect to dealing with whatever issues were needed to be resolved to get that chops through. That's futility. And in most instances, you should be held to the benefit of your bargain. So, for example, we agreed that TINFINC and TMI would populate these grievance committees 50-50. It's not futile that they had a blocking position necessarily. We agreed on a whole host of mechanisms that delimit our ability to go out and prevail on a claim necessarily in a court if we don't grieve first. We agreed to a lot of that stuff. What we didn't agree to was a process whereby, for whatever reason, the union had already decided that it was not going to act in good faith to allow that process to unfold through the contractual grievance. That's futility, and I think that's a difference between futility and repudiation. But either one gets us to where we need to be. I'll give you a minute to wrap up. I'm sorry, sir. One more minute to wrap up. I'd like to reserve the minute if I could. And thank you very much for the courtesy of the extra time. Both sides are going to get extra time if they want it. Good morning, Your Honors, and may it please the Court. My name is Ed Gleeson from the law firm of Hirsfeld, Seward Holtz, Kestel, Linniski & Law. I hear I represent all of the Appleys, the International, as well as the TINFINC, which is the National Negotiating Committee, as well as the three Kansas-based locals. I'm here today to try to perhaps cut through some of the confusion. Some of the confusion that I think still exists here, or perhaps it's just an unwillingness to recognize, that the appellants have actually conceded in their first amended complaint that this change of operations was not simply a change of operations. They have conceded in their first amended complaint, in several paragraphs, that what they were seeking was not just seniority integrations about whether to dovetail or not to dovetail, but to change, to modify the collective agreement itself. Now, they have wrapped that up and called the Change of Operations Committee a grievance committee. It's a grievance process that's subordinated to the National Grievance Committee. But the point I still want to come back to... What do you mean by that? A Change of Operations Committee, like many other of the committees under the National Master Freight Agreement, has separate, is field specialized committees. They make their determinations within the mandate that they're afforded under the contract. What mandate they don't have is that you can't change the collective bargaining agreements, terms and conditions of employment themselves. So they deal with specialized things dealing with one of the four operating companies. If they're going to consolidate their terminals, how do you deal with the dovetailing of seniority from one terminal to the other? It doesn't deal with the changing of work rules and conditions and grafting from one operating company's work rules onto another operating company's work rules that are in effect under that contract. So the problem here is that the Change of Operations Committee, there was no repudiation of this. The problem was it was an inappropriate process by which the appellates were seeking to secure here. Did Yellow need the union's cooperation or permission to close down these other locations to shrink the business? Why would the union have anything to do with that business judgment purpose? Yellow has management rights under the contract to make changes of operations for each of the four individual standing companies. What Yellow, and I talk Yellow for collectively, but what the operating companies don't have the right to do under that contract is to graft each of their own work rules onto another of the operating company's work rules or to replace them. They also don't have the ability under the contract or under Section 8D of the National Relations Act to modify the contract itself midterm. So the union was an essential player participant in this process that Yellow undertook? Your Honor, it would have been an essential player in this, and the CHOPS committee had been an appropriate one presented to it. The committee advised Yellow, collectively Yellow, on several occasions that they had two choices. They could either adhere to the contract and not simply try to midterm modify it through a CHOPS process, or they could come back and present one that was appropriate, that would actually fit within the parameters of the CHOPS process. Yellow chose to do neither one until late in the game. Yellow came back, and frankly, without ever attempting to file a grievance order, seeking whether it's a grievance or an interpretation as to whether the union was right, the committee was right. If the union's an essential player, they do have a duty under the master agreement to, you know, operate in good faith or cooperate. The allegation in the complaint here is that the union was not merely recalcitrant. It was actively opposing the consolidation here. If that's true, then the grievance process was wholly illusory, wasn't it? Well, again, we're confusing what the real grievance process is versus the CHOPS process. There was nothing that the union did that was inappropriate. The union followed the contract. The union followed the contract and was trying to get the companies to do the same thing, to present a real CHOPS, an appropriate CHOPS change of operations, as opposed to trying to force-fit midterm modifications in a collective bargaining agreement that do require membership ratification. It's done through consent under 8D of the Act. None of that was happening. They wanted to circumvent their duty under 8D of the Act to actually negotiate changes in the collective agreement. So that's – I'm getting confused. I shouldn't say getting. I've been confused from the start about what's going on here. So what you're saying is this wasn't a – shouldn't have been a CHOPS procedure. This should have been a renegotiation of the contract procedure. Well, then, that's not something that's grieved. So the district court, when it threw out the complaint for failure to exhaust grievance procedures, there's no grievance procedure to address that sort of thing, is there? In this situation, the court did correctly dismiss this case on exhaustion under Maddox because the companies did have the right to challenge the decisions and the actions taken by the unions and TINFINC in saying that this is not an appropriate change of office. They could have sought an interpretation. They could have followed grievance. They didn't do that. They pivoted to instead later in April and in the May 30th LOA where they sought to open the contract. Don't use too many acronyms. I'm having hard time keeping up. LOA? I'm sorry, letter of agreement that they proposed on May 30th. It's in their record, Your Honor. Where they went and they basically said we're not going to take either of the options through the CHOPS process by putting one that's actually appropriate and going through that method. Therefore, they never actually grieved or even sought an interpretation as to whether our position was correct. They instead pivoted. They pivoted by saying we now will propose to open the collective bargaining agreement 10 months before the contract expires. So what should they have grieved? They should have grieved the appropriateness. Under the contract, they had the ability to grieve whether the unions in the committee, whether its decision and position was accurate, whether it was appropriate, whether it was correct. What was the union's position? That it was not. I thought the union was just saying we're not going to pursue this. No, it's not the record at all. The record shows that the union told the companies on multiple occasions that the CHOPS could win. Let's be clear about the record. We're limited to the complaint and what's alleged in the complaint. And the complaint alleges what you're about to say. Is that right? Yes, it does. And in the complaint themselves, they've actually pointed out that the union gave them two choices. Either come back and present something that's an appropriate CHOPS proposal or seek to open the contract early under AD the Act. What the companies ultimately did. Well, there was no CHOPS, proper CHOPS issue. I thought they were trying to arrive at how to assess seniority when these various units were merged. They never actually asked for consent on or tried to reach an agreement on seniority? Because that would have been a proper CHOPS procedure, would it not? Yes, had that been in and of itself what they were seeking, but they were seeking much more. Okay, but they were seeking that. And much more. So that's the appropriate CHOPS procedure. They might have gone beyond what CHOPS allows, but there was appropriate CHOPS procedure. They would have had to change it because they enmeshed it. What they really were seeking to do was to take four separately operating companies and to merge them without legally merging them. What they were trying to do was to circumvent the marketing procedure, again, that's required under AD of the National Labor Relations Act, and try to avoid that entire process by trying to accomplish something, the merger of these four entities without legally merging them, through a process that doesn't allow for that. Had they stuck to even the, if you've heard about, I'm sure you've read about Phase 1 proposal. That was an appropriate one because it did apply the actual terms of the contract. They didn't seek to change the terms. What they did differently in their proposal in Phase 2 was to, instead of creating what they call utility drivers, what happened in the West, which they had the right to, but they were given the choice. The drivers were given the choice to take that position. Instead what they were doing here was to compel road drivers to become utility drivers, wholly different operations. One is over the road, the other is local city drivers. Our contract is old. Our contract is, you know, since 1964 and has grown, you know, ever since. There are a lot of rules. There's a lot of terms that are in there that the company just wanted to evaporate. They wanted to get rid of them, and they wanted to do it in their terms quickly without going through the appropriate process. Counsel, can I ask, what I'm hearing is Yellow says at this point that the teamsters have repudiated any efforts towards resolving this CHOPS process. What I think I hear you say is, well, it was not a proper CHOPS process from the onset. So at that point in time when there's this disagreement, what's your position on what Yellow should have done then? On that basis, they should have filed a grievance under SPARTA. But where? Should it have gone to the National Grievance Committee, or were there other options? Whether it goes to this, you know, under the supplement, because remember this was multi-region. So they could even have initiated under the supplement, but even there it will ultimately end up to the National Grievance Committee. But what do you think they, so you think there are a variety of options they had to grieve, whether it's through a supplement or local or at the national level. But what does the NMFA say, if anything, which was the best or the proper option at that point? Well, they would have, I mean, under, if they wanted to continue with their CHOPS as they had proposed it, they had the right to file grievance, one or more grievances, to one or more even supplemental, you know, grievance panels, grievance committees. They didn't do that. Those grievance committees would have had to develop a record. That record would have gone to the National Grievance Committee. And unlike, I'm sorry. I'd like you to tie what you're saying to the language in Article 8. So Section 1, this is not a factual grievance, is it? I think there were, had there been any grievance, one was never filed. Had there been grievance, filed. What were the factual issues? Well, the factual issue is, for instance, you know, the application, it's a mixed, probably, facts and law, but they would have had to determine how can you graft, take Yellow Holland, which is one of the operating companies, take their designated terminal agreement rules and apply it to Yellow Freight, a separate one. That's not a factual issue. That's a legal issue. Well, it'll brace facts as to what the classifications are. No disputed facts. Well, the dispute. I'm trying to see, because factual grievances are questions of interpretation arising under the provisions of the supplemental agreements. But these do occur under the supplemental agreements because that's where the work rules are, Your Honor. The dock workers, which are local cartage, are under the local supplements. They are not, you're not going to see that in the National Master Articles 1 through 39. You see that in the supplements. What you're hearing from my colleague, Mr. Rossi, is that the operating companies and their parent, Yellow, didn't want to start there. They didn't want to, they wanted to circumvent that whole process. And in doing that, they're confusing the national grievance process that they negotiated for, and calling the, you know, the CHOPS committee a grievance committee that we therefore repudiated, when in fact it's, they're the ones that went to a CHOPS committee, never attempted, as Judge Robinson pointed out, to file an appropriate grievance at all. And so with that— This is all very interesting. I don't remember reading any of this stuff. Well, you'll— Did the district court grapple with the sorts of arguments you and Mr. Rossi are making today? They're very interesting, but they're pretty complicated, and I don't know that it had anything to do with what happened in district court. Well, Your Honor, what the district court did was to dismiss this on Clayton—I'm sorry, on Maddox, not Clayton grounds. And frankly, she was absolutely correct. Well, maybe she was, but it's so hard for me to see what sort of grievance was supposed to be filed. And maybe you're right, they had to do it this other way, but I didn't see that being disputed in district court. I could easily have missed it. And what appeared, from my reading of the briefs at least, was that the claim was that Yellow didn't grieve what the IBT was doing— And they did not. —when IBT was just refusing to engage in the CHOPS process. And I don't recall any development, at least, of an argument that, well, they were asking for so much more than what you can do in the CHOPS process. I just don't recall—was that presented to the district court? Yes, that's what we've argued to the district court, both in our opening papers on the 12b-6 as well as our reply brief, yes. We presented to the judge what I'll call two fundamental bases by which their first amendment complaint should have been dismissed. One is the exhaustion and rheumatics. Two goes back to this midterm modification issue, that's garment preemption. They should have—it was going to—what they're alleging, they're packaging it in different ways, but they're saying that we negotiated in bad faith. And recall, again, Your Honor, as of no later than May 30th, the companies pivoted to seeking to midterm modify—negotiate the contract. And they're saying that—they're calling it a breach here, but what they're saying is that we negotiated in bad faith. That's garment preemption. It exclusively is an issue that can be resolved by the National Labor Relations Board. So the judge didn't get to that issue. She got to part—you know, point one, not the second point. Why shouldn't she have allowed the—an amended complaint based on newly discovered evidence? I mean, it's a fairly low bar, isn't it? Well, I think from the appellant's point of view, it's a high bar for them to make. It's an abusive discretion standard. And what you'll see out of the two tomes that really were the original complaint and then the first amended complaint, as I believe my colleague, Mr. Rossi, has pointed out, very little is substance. They were almost identical to one another. And in that, it was basically ad hominem attacks against the general president, who was also the chair of TINFIG, you know, for the union. Well, it's not ad hominem to say this is what he declared. That shows that he had no interest in negotiating. When I say ad hominem, you know, calling somebody a socialist and, you know, trying to change—and holding people ransom, I think that's ad hominem. I would differ with you on that. And that's what that whole complaint and the first amended complaint is peppered with. It was a PR, you know, piece of paper more than it was a truly well-played complaint. Well, there might have been colorful language, but the substance of it was that at the general executive board meeting, was it, that he said we're not going to engage in this chops process anymore, which may have been okay. That's what we're learning now. But that was a new fact that wasn't available before. And to say they should have discovered that with how many thousands of pages were that they had 10 days to get? That seems a little harsh to me. Well, what the court held in terms of that issue about newly—Tinpovich's—I'm sorry about that. In terms of what the judge is asking us, you know, was that newly discovered? It wasn't. What the judge held, it was cumulative. It was buried not—well, obliquely. It was scattered throughout the original and then the first amended complaint. So for them to come in and say now that this is newly discovered that there was even hostility towards the chops process that they were trying to force upon us is not new. Well, she said—I think the judge said this was subjective. The view that they were opposed to this was subjective. And I don't think it's subjective when you have the person saying we're not going to participate in the chops process. That's a little different than what I understood Judge Tinpovich's point. With the question on the hostility in that regard, the question really goes to the one of bias. And I would point the court to the brief filed by Yellow in the ABF case where it's well laid out by Yellow's attorneys when they pointed out that in a context where— of the National Master Freight Company's ABF sought money damages against the union and the company and hundreds of millions of dollars, Yellow successfully argued, as did the union, that it was a Clayton exhaustion problem. But in that as well, there was also arguments being made by ABF about the hostility, the futility, if you will, of going forward in the process. And what ABF sought to do was to change the composition of the grievance panel because of claiming bias. That's not what the company and the union or unions have bargained for. And it's laid out very well in the brief that Yellow itself presented to the court within the 8th Circuit. So it's just not an appropriate argument to make whether it's under futility. And again, we've discussed, I think, pretty comprehensively about the lack of any repudiation. But if futility didn't exist here— Can I ask about sort of the status quo? Because district court dismisses on a 12b-6 and says they failed to exhaust the grievance process. But now, as we heard Mr. Rossi say, he's representing a ghost. Yellow's in liquidation. So are they left with no potential remedy because they can't—do they even have the ability to grieve at this point because they're not even a company anymore, are they? They chose never to file a grievance. The contract expired on March the 31st of 2024, approximately one month before they made their motion to amend. So in my view, the answer to that is there's nothing to grieve because there's no grievance process left. The contract is terminated. And as they say, what we're looking at on the other side would be ghosts anyway. My point to you, Your Honor, would be that they had their choice. They were given multiple times the choice. File a grievance and go through that route or go through midterm modifications and we'll go through the other route. And recall, all of this was taking place within months, just months of the end of the contract. The contract expired March 31, 2024. There's a 60-day window period under Section 8D of the National Relations Act in which to open the contract and to modify it or to terminate it. In this case, the contract, because the company or companies were in liquidation, the contract simply terminated. So if they are left with an empty bag, if you will, it's their own fault, not ours. So again, in my view and what we present to you, Your Honor, is two things. One, the judge did get it right with exhaustion. They never even made an attempt to file to utilize the national grievance machinery. Two, when they pivoted away from even attempting to make a grievance, file a grievance, and instead they sought to midterm modify the contract, that began 8D of the Act. That requires the consent. It's what's called a non-mandatory subject to bargaining. It requires two parties' consent to open a contract early, midterm modify it. So when they say that we were, or the general president and the chair of TNFIG was holding them basically hostage-seeking ransom for wages, there's nothing wrong with that, Your Honor, especially from an institution whose members lost approximately $5 billion since, you know, this fiasco began back earlier in the 2000s to put a condition on their consent, the union's consent, to midterm open the contract. The companies did not want to do that. And, in fact, they created a charade through their May 30th LOA by saying we'll put money on the table, but it's conditional on some event further down in time. No date certain or anything like that, that the banks would actually finance them. Let me try to understand. What do you think Yellow should have done to grieve? What would be the grievance it should have brought and where? They could have brought a grievance to under the, just the, for instance, under the central supplement, to central southern, I'm sorry, the central or the southern supplement, or even the eastern supplements, but in the central where they were focused, and they would have filed a grievance seeking either determination that the union's position, that the chops process is inappropriate, period, or two, they could have brought a grievance saying that the union's acting even in bad faith. That would have been an unfair labor practice. They chose not even to do that. But they had opportunities to bring both grievances and interpretations to the national grievance machinery. And does the complaint show that the Teamsters responded to the chops proposal by saying this is not an appropriate chops proposal? Yes, it's in the First Amendment complaint. They've actually, I believe, quoted John Murphy, who is the director of the TNFIC, pointing out when he pointed out to his members that the, they had two choices in front of them, present an appropriate chops, a chops proposal that's appropriately belongs to a chops committee or midterm open a contract. Okay, so the Teamsters told Yellow that they didn't think this was an appropriate chops proposal. And you're saying at that point the Teamsters should have grieved that and said that's. Not the Teamsters, but Yellow, the operating companies.  Yes. But they, again, Your Honor, I believe that the court got it correct in the trial court on the exhaustion. But, again, on a motion to dismiss, we, again, argued preemption as well under the midterm modification rule under 8D. Under 8D of the NLRA. Yes, I'm sorry. We've got two 8s. You're right. 8D of the National Labor Relations Act. And for a midterm modification under Section 8D of the National Labor Relations Act, they have to go through a different process. And that's what they chose, ultimately what they chose to do. But they're accusing now, and in that path, that we've engaged in bad faith bargaining. That's an unfair labor practice, arguably, what they're alleging. And that's a garment preemption that belongs exclusively to the National Labor Relations Board. So we argued, again, that to the district court as well. I think that for that reason alone, the second reason, we're entitled to it. And finally, I know. You're going to get some extra time for that catch up. You know, in terms of when the, it was an odd procedural situation here. The complaint originally was filed in late June of 23. They sought an injunction for, you know, for their delinquency and health and welfare contributions that were going to, and terminating more than 11,000 families' benefits later in July. They pivoted in, later on, again, they were already ready now to try to go forward with a midterm modification. They filed, their complaint was filed right on July 19th or 20th of that year. They filed their first amended complaint as a matter of right, because we had, we're filing a motion to dismiss. We did file our motion to dismiss the day of the injunction hearing. That injunction was resolved on the 20th and then within order. And then there was an appeal that took, you know, and then it was, that happened. But then they waited instead and sought reconsideration from the court. This is after a whole bunch of other procedural items moving, trying to transfer it. They wasted so much time that they didn't even file their opposition to our motion to dismiss until November. So, in November of that year, they're already in bankruptcy. And in November of that, and then they waited instead for the judge to rule in March. What's your point here? What difference does this make? Well, again, it goes to the point that this is carriers who had a real, an objective to simply force fit what they wanted to accomplish through a mechanism that doesn't belong. They should have negotiated, and they're the ones that, you know, dithered until it was too late. Thank you. That's really my point. But the amendment itself that they sought to make didn't happen until a month after the National Master Freight was already gone. And that's, so, Your Honor, thank you for your consideration. And I would ask respectfully that the court uphold the district court's decision and deny the appellate's appeal. Thank you. So, thank you all. Mr. Rossi, I'll give you five minutes. Don't go over. This may be what you're going to address, but I really want to know why you didn't grieve the way opposing counsel suggests. Okay, thank you. I do want to correct or sort of extend on one factual point in the record so that the court is clear about something. Mr. Gleeson and I seem to be in total agreement that the Phase I CHOPS was an appropriate CHOPS. And, in fact, it was put through the grievance process of the contract, Article 8, Section 6, CHOPS grievance process, and it was approved by all the constituents, and Phase I went into effect in the West Coast, affecting the reorganization of 20% of Yellow's network. The Phase II CHOPS started, as we've alleged, with a mirror image of the Phase I CHOPS. It was the exact same substantive CHOPS. The union then approached Yellow, we thought in good faith, and said, we have some concerns about doing Phase II CHOPS giving its size the same way as the Phase I CHOPS. Would you change your CHOPS to address certain of our concerns? Because it wasn't going to have a… This is in the complaint. This is in the complaint. We did exactly that. We changed the CHOPS at their request to meet some concerns they had, and since it didn't have any effect on the operational efficiencies that Yellow was trying to achieve, it didn't make any difference to us, and we thought it would help get the process finished. Mr. Gleeson just stood here for the last 10 minutes and said, because we changed the CHOPS to something they wanted, and this is all alleged, it was suddenly an improper CHOPS that they could reject. Once they told you it was improper CHOPS, then didn't you have the right under Section 1A of Article 8 to grieve them? We did not have the right, nor were we contractually obligated to, and this was something we were touching on before. Section 1A deals with local disputes. That's the jurisdictional ambit of that section. What they're saying, I thought, is that these changes in work requirements and so on were prohibited under the supplemental agreements in that area, in that part of the country. I thought that's what he said. But there's no single supplemental agreement that was otherwise subject or affected by Phase 2 CHOPS that could have resolved the issue. All a supplemental agreement grievance process can do in Article 8, Section 1, is deal with a grievance that's particular to that local geographic jurisdiction into the supplement, out of the supplement, or within the supplement. You can't have more than one supplement agreement at issue? So I guess in that regard, his suggestion would be that because they rejected the actual grievance process that we contractually agreed would deal with at CHOPS, we should have then gone and instituted 14 or 15, or however many supplemental agreements were at issue, individual grievances through every one of the supplements, then had them be reviewed by however many multiple joint area committees would have overgirded those supplements, even though no single joint area committee could have covered the entire ambit of what was at issue, simply because they decided that after we agreed to change the CHOPS to better suit them, they no longer wanted to deal with the CHOPS. That's not how the contract is designed to work under any scenario and is not something Yellow agreed to contractually. Since we didn't agree to ever do a grievance that way contractually, we can't be held to account for having failed to exhaust something we didn't agree to do. That's a replete in the case law again and again and again. And so, again, I have a lot of respect for Mr. Gleason's experience with the unions and his lifelong commitment to that, but he is simply wrong to suggest that we were somehow, could be forced into some non-contractually agreed to ad hoc mechanism to deal with something after they rejected the very custom process that was designed to enable changes of operations, and even after we changed the CHOPS to better suit them, which they then turned around and immediately rejected. And so in that regard, I think he's just flat out wrong. Thank you, Councillor. Thank you. You want 10 seconds? I appreciate that. Really be quick because this is highly unusual. You know, two things. One, Mr. Rossi is talking about more the exhaustion side of this. Number one is he just pointed out they do control what they put together as a CHOPS application. What he's missing is the fact that even when they took our suggestion that it didn't work well in the first Phase 1, you know, that you may want to look at it again. And what they did instead was make it worse by now trying to compel people to, you know, to that. And that's inappropriate. It violates the contracts. So they're just mistaken. Thank you, Your Honours. Good arguments. Case is submitted. Councillors excused.